

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: Maxine Renee Adams | § § | |
| DEBTOR(S) | § § | CASE NO.   09-33259 |
| Navy Federal Credit Union | § § | |
| PLAINTIFF(S) | § § § | ADVERSARY NO.   09-3225 |
| VS. Maxine Renee Adams | § § § | |
| DEFENDANT(S) | § | |

**ORDER REGARDING COMPLAINT TO DETERMINE
DISCHARGEABILITY OF DEBT**

Before the Court is the complaint of Navy Federal Credit Union seeking a determination of the dischargeability of its debt under 11 U.S.C.§ 523(a)(2)(C)(i). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding.

**I. Facts**

Debtor is a 35 year old school teacher.  In 2008, debtor earned approximately $45,000.00 from teaching and from a sole proprietorship selling "Hug A Blocks," a soft cube toy for babies that holds family pictures.  In 2007, debtor earned approximately $41,000 from all sources.  Debtor's husband is a front office manager for Hyatt Regency where he has worked for 11 years.  Debtor and her husband have four children.

In 2005, debtor filed suit against her landlord, Andover Properties, seeking $5,000.00 in damages for a flea infestation of her apartment.  The landlord appealed an adverse judgment.  On appeal, the appellate court reversed the judgment of the lower court.

On November 25, 2008, the appellate court awarded judgment against debtor in favor of Andover Properties for its attorneys fees in the amount of $16,000.00.  The next day, on November 26, 2008, debtor opened a credit card account with Navy Federal Credit Union.  Debtor maintained a checking account Navy Federal Credit Union and had obtained her first loan from the credit union to purchase a car when she was 18 years old.  In addition, at the time she obtained the credit card, debtor was in good standing on an unsecured loan with the credit union, making timely monthly payments via automatic withdrawal from her account.

At the time she obtained the credit card, debtor was approximately 6 months pregnant with her fourth child, who was born in February 2009.  Debtor testified that she obtained the Navy Federal credit card in November 2008, " to use as supplemental income while I was on maternity leave."

Debtor's maternity leave was unpaid.  Debtor received her last paycheck, earned prior to maternity leave, on March 4, 2009.

Debtor testified that despite the judgment in favor of Andover Properties, she went ahead with her plan and withdrew cash advances from Navy Federal "just like a paycheck," just as she "had planned."  On March 31, 2009, and on April 2, 2009, debtor obtained cash advances in the amount of $2,500 each from Navy Federal Credit Union with her credit card.  Debtor testified that taking the cash advances was "almost simulating a paycheck." Debtor testified that she used the cash advances from Navy Federal "to do exactly as we had intended" and used the funds as "supplemental income" during her maternity leave.

Debtor testified that she had expected to have the ability to repay cash advances made with the Navy Federal credit card from approximately $6,000 she expected to receive from her tax year

2008 tax refund and from her share of grant money awarded to her school. Debtor testified that in November 2008, she was told that depending on the teacher's job performance, each teacher could expect to receive between $2,600 and $3,000 from grant money that had been awarded to her school.

Debtor testified regarding her intent to repay the debt to Navy Federal Credit at the time she withdrew the cash advances:

> Q. . . .where is the intent to pay them back ?
>
> A. Well the intent to pay is in the knowledge that Navy Federal is not aware of, that we knew. Okay, the fact that I'm not working is not an unknown. I knew I was pregnant, I knew I was going to have a baby, I knew that this was my fourth child . . . I knew that I needed to be at home.
>
> And so during that time, the anticipated income of my bonus, the anticipated income of our tax return, not only gives us the ability to repay, but the ability to give back in a big chunk of money in a short amount of time. And at the time that the bonus came in July, you can look in my financial documents and see that. No income, no income, no income, and then income starts back even higher than before. And so the intent is very much there, not short term, but we knew in the long run, that this money would enable us to pay back Navy Federal . . .
>
> And so, you know, I mean, going on maternity leave was not a guessing game for us. It was not a 'what if.' We knew we were going to need some income during that time, so that's not, you know, an intent that says, 'Okay, let's just go on maternity leave and not work.' This was something that I had to do for my family.
>
> And so in the long run, in the big picture, if you look on our income statement, July, 'Boom!,' there is the money! 'Boom!,' there is the tax return!

Debtor was released by her doctor to return to work on April 1, 2009, but did not return to teaching until the final three days of the semester before the summer hiatus began. Debtor did not teach summer school or obtain other employment for the summer.

On April 7, 2009, Andover Properties applied for a post-judgment writ of garnishment. The writ of garnishment was issued for execution on April 13, 2009, and delivered by the constable to Chase Bank sometime on April 14, 2009. In the very early morning of April 14, 2009, at 1:28 A.M.,

debtor obtained credit counseling from Money Management International, Inc. pursuant to 11 U.S.C. §§ 109(h) and 111. Chase Bank placed a hold on debtor's account on April 14, 2009, and notified debtor of the hold by letter dated April 17, 2009. According to the letter notifying debtor of the hold on her account, the account held $454.46 at the time of the garnishment.

Debtor testified that she obtained credit counseling in direct response to discovering that her Chase Bank account had a negative balance. For debtor's testimony in this regard to be true, the constable had to deliver the writ of garnishment to Chase Bank, Chase Bank had to place its hold on debtor's account, and debtor had to have checked her account balance between midnight and 1:28 A.M., the morning of April 14, 2009.

Andover Properties sought post-judgment discovery of debtor's Social Security number and information about any other financial accounts. Andover Properties filed a motion to compel disclosure that was initially set for hearing on April 27, 2009, and was reset to May 12, 2009. Debtor realized that Andover Properties did not know that she had a checking account at Navy Federal. Debtor testified that she did not believe Andover Properties should have access to all of her accounts and refused to disclose any information.

Debtor obtained another credit card cash advance in the amount of $2,500 from Navy Federal Credit Union on April 22, 2009. Debtor also met with a bankruptcy attorney on April 22, 2009. Debtor explained her understanding of her situation after meeting with the attorney on April 22, 2009:

> A. I found that they [Andover Properties] didn't know about Navy Federal and that they could not get the information about Navy Federal unless they asked and I resolved that we would just call the $300.00 a loss and just refuse to give the other party our social security numbers.

> I refused to give them our bank account numbers for Navy Federal, they in turn filed a motion to compel to make us give out the information, and so I just resolved that I was not going to do that.
>
> And in May, you know, I talked with my dad and he said, 'Well if you don't give the information, what happens?' And I was like, I don't know, we didn't do anything wrong, I don't feel that they should have access to all of our accounts, and basically my dad said I would be held in contempt of court if we don't give them the information . . . . so I ultimately had no choice, but to file for bankruptcy and the date of the motion to compel hearing was the 12th of May, I filed on the 7th . . .

Debtor further testified:

> A. After we met the attorney, and I learned that I didn't have to give out that information, that I didn't have to, then we just said, 'Hey, we'll just call that a loss,'. . . I was talking about the $300 that was in the account.
>
> And that we would just live on Navy Federal. We'd just use everything, since they didn't know about that account . . .

Debtor was questioned by the Court:

> Q. How much money in the Navy Credit account at the time of the garnishment or [when] they were moving to compel?
>
> A. We put nothing in the account, we did everything cash and carry, because we didn't know if they were going to find it or not. And so, we pretty much worked with money orders and kept cash because we didn't know if they were going to find the account . . .
>
> They didn't know that we had anything in cash. They basically wanted our Social Security numbers because they wanted to know all account information. And, at the time, all I knew is that they had just seized, uh, you know, did this on our checking account.
>
> And it wasn't to defraud anybody. I just needed to pay bills and make sure that if I put any money in and all the sudden if they find Navy Federal, that I wasn't going to be able to pay rent or pay hotel or pay diapers.
>
> So it wasn't my intent you know to hide from our creditor. My only intent was,
>
> 'Okay, you know, they've taken this money. What happens if they do the same thing
>
> to Navy Federal? And that was the honest thing. And I honestly believed, I didn't

think, prior to all this, before they filed the motion to compel, I honestly believed that they would never find it.

Debtor was questioned about her intent to repay the final cash advance taken April 22, 2009:

Q. You're living on Navy Federal when you filed May 7th and you're next income is May 31$^{s,t}$ according to your pay stub. How were you going to pay that last 2,500 dollars back?

A. Well on April 22$^{nd,}$ that was the time that was about three weeks away from [when] we did the last one. We were pretending like the motion to compel wasn't going to happen. So when I took it on the 22$^{nd,}$ we were intending to pay at the end of summer and when our tax return came in.

And I think I physically filed [the tax return] in May and I knew that income was coming in a short amount of time. So as soon as that tax return came in, we were going to use that to pay that back right away.

Q. And this is the deposit to your Navy Federal Credit account?

A. Yes.

Debtor explained that despite her intention to repay Navy Federal, she was unable to do so due to a change in her family's circumstances. According to debtor, her family's circumstances were not changed by Andover Properties' collection efforts because she "pretend[ed] like the motion to compel wasn't going to happen." Further, her family's circumstances were not changed by the birth of her fourth child because her lack of income during maternity leave was "not an unknown," "not a guessing game," "not a what if." Rather, debtor's family's circumstances changed, rendering her unable to repay Navy Federal because the family had to move from the home she had been renting, and live in a hotel until she and her husband located another home to rent.

Debtor testified that she and her husband had been paying $1,500 per month to rent their home from someone who was working in California. Debtor testified that during the previous year, the homeowner had notified debtor and her husband that the homeowner would be returning to Texas

so they would need to relocate, but a week prior to the homeowner's expected return to Texas, he had changed his mind and remained in California. Based on this experience, debtor thought the homeowner might change his mind again and ignored the homeowner's notice in 2009 that in 90 days her family would need to relocate. Despite 90 days notice, debtor made no preparation to move or find another home to rent. Consequently, debtor and her family stayed in a hotel for two months at a cost of $1,800 per month, while they looked for a house. Debtor and her family moved into a house in September 2009, which they rent for $1,100 per month.

Applying a timeline to debtor's explanation of the unforseen derailment of her intention to repay Navy Federal shows that debtor's testimony regarding her intention to repay is not credible. Debtor testified that she took cash advances in March and April with the intention of repaying the advances with funds she would receive in May and July, but her circumstances changed when her landlord gave her 90 days notice that she would need to move. Since debtor moved into a new home in September, she lived in a hotel during July and August. This means that debtor moved from her rent home at the end of June and had been notified of the need to move 90 days previously, in late March or early April. Thus, at the time debtor took the cash advances from Navy Federal in March and April she knew that her circumstances were: (1) she would have no income from her employer until the following school year, (2) she had a judgment creditor searching for her assets to pay its judgment, (3) she needed to find another place to live, and (4) she would receive about $5,800 during the summer. The Court finds that debtor's financial circumstances, both her needs and her ability to pay for them, did not change between November 25, 2008, and September 2009. The Court finds debtor's testimony that at the time she took the cash advances she intended to use the funds she would receive during the summer to repay her cash advances from Navy Federal is not credible. The

Court finds that debtor knew at the time she withdrew each cash advance from Navy Federal that she took the advances without any intention of repaying Navy Federal. Debtor knew that at the time she obtained her credit card from Navy Federal, she had for many years always timely repaid loans borrowed from the institution. Debtor also knew, and testified that when she obtained the credit card and withdrew the cash advances, Navy Federal did not know that she was planning on living on funds borrowed from Navy Federal instead of employment income for several months.

Debtor filed her Chapter 7 petition on May 7, 2009. By July 2009, debtor had received both the anticipated school bonus of $2,600, and her tax refund in the amount of $ 3,200.00. Debtor explained to the Court her understanding of the concept of the honest, but unfortunate, debtor:

> A. From my reading, I read that there was a difference between a fraudulent debtor and an unfortunate debtor and that it was unfortunate that the people who wanted to collect from us, even though we're a family with children, it was unfortunate that they chose to try to compel us to give out all of our information. It was used to do exactly as we intended while I was on maternity leave. . . I have the ability to repay, as I told earlier, with the Governor's grant and also with our tax returns . . . I never used the money fraudulently or went on a shopping spree it was used to do exactly as we had intended, for supplemental leave while I was on maternity leave.

Debtor testified that she is currently paying her credit cards issued by Target, Chase Bank, and Bernini.

> Bankruptcy Code , 11 U.S.C. § 523 (a)(2)(C)(i)(ll), provides:
>
> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
> . . . .
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
> . . .
> (C)(i) for purposes of subparagraph (A)--
> . . .

>   (II) cash advances aggregating more than $875 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 70 days before the order for relief under this title, are presumed to be nondischargeable . . .

11 U.S.C. §523(a)(2)(C)(i).

To prove a cause of action under 11 U.S.C. §523(a)(2)(A) for fraud with a credit card, the creditor must prove for each card-use, that: (1) the debtor made a representation; (2) it was knowingly false; (3) it was made with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on it; and (5) the creditor sustained a loss as a proximate result of its reliance. In re Mercer, 246 F.3d 391, 404 (5th Cir. 2001).  The Mercer court found that a debtor makes a representation of intent to pay at card-use, not at card-issuance. Id., 246 F.3d 391, at 405.  The Mercer court concluded that it would be helpful for the bankruptcy court to consider 12 non-exclusive, non-dispositive factors in determining whether at card-use, the debtor knew her representation was false: the time between card-use and the bankruptcy filing; whether, prior to card-use, an attorney was consulted about bankruptcy; the number of charges; their amount; the debtor's financial condition at card-use; whether the limit was exceeded; whether multiple charges were made on the same day; whether the debtor was employed; her employment prospects; her financial sophistication; whether her buying habits changed suddenly; and whether luxuries or necessities were purchased.   Id., 246 F.3d 391, at 408.  Further, where a debtor testifies as to her subjective intent, the bankruptcy court must make a credibility determination, considering the debtor's testimony, along with other objective circumstantial evidence of the debtor's subjective intent. Id., 246 F.3d 391, at 409.  If the bankruptcy court finds that, by card-use, the debtor made a knowingly false representation of intent to pay, then the separate requisite intent to deceive is also present. Id., 246 F.3d 391, at 411.  The credit card issuer establishes actual reliance on a debtor's

card-use representations as a matter of law by making the loan. Id., 246 F.3d 391, at 416 - 417. Justifiable reliance on a statement of intention is reason to believe the intention will be carried out. Id., 246 F.3d 391, at 424. A card issuer that knows facts that will make it impossible for the debtor to carry out his intention, cannot be justified in his reliance on the debtor's representations. Id., 246 F.3d 391, at 424. The Fifth Circuit summarized its holding in Mercer as follows:

> For Mercer's § 523(a)(2)(A) nondischargeability vel non, we hold, as a matter of law, for each card-use: she represented her intent to pay the loan; if her representation was knowingly false, she intended to deceive UCS; it actually relied on the representation by authorizing the requested loan; and its loss was proximately caused by such reliance. On remand, to be determined for each representation is whether: it was knowingly false; and UCS justifiably relied on it.

In re Mercer, 246 F.3d 391 (5th Cir. 2001).

A debt for cash advances from a credit card in the amount at issue obtained within 70 days of filing bankruptcy is presumed to be nondischargeable pursuant to 11 U.S.C. §523(a)(2)(C)(i). However, Navy Federal did not rely on the statutory presumption in presenting its case. Navy Federal presented evidence amply supporting each element of its cause of action for fraud in accordance with the Fifth Circuit's holding in Mercer. Navy Federal proved that for each card-use, debtor represented her intent to pay the loan; that her representation was knowingly false, that debtor intended to deceive Navy Federal; Navy Federal actually relied on the representation by authorizing the requested loan; and Navy Federal suffered loss that was proximately caused by such reliance. The Court finds that debtor obtained cash advances from Navy Federal with her credit card without any intention of repaying the debt and Navy Federal justifiably relied on debtor's representations and

suffered a loss in the amount of $7,500 proximately caused by such reliance. The Court finds that debtor's debt to Navy Federal is not dischargeable for fraud.

Based on the forgoing, it is

**ORDERED** that Navy Federal Credit Union is awarded judgment against the debtor Maxine Renee Adams in the amount of $7,500 plus attorneys fees; it is further

**ORDERED** that such debt is not dischargeable under U.S.C. §523 (a)(2); it is further

**ORDERED** that Navy Federal Credit Union shall submit an affidavit in support of requested attorney fees and costs within 10 days. Debtor is ordered to file a response containing any objections within 10 days. If the affidavit is disputed, the court will set a hearing thereafter.

SIGNED 09/22/2010.

Karen K. Brown
United States Bankruptcy Judge